**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| **CHANTANEE MOORE** ) | |
| ) | |
| **Plaintiff,** ) | |
| v. ) | **CASE NO. 1: 24-CV-1501** |
| ) | |
| **TESLA, INC.** ) | |
| ) | |
| **Defendant.** ) | |

**COMPLAINT**
**(Demand for Jury Trial)**

Plaintiff Chantanee Moore complains of and seek damages from TESLA, Inc. under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. For these causes of action, Plaintiff states as follows:

**PARTIES**

1. Plaintiff Chantanee Moore ("Ms. Moore" or "Plaintiff") is a Texas Citizen who resides in Austin (Travis County), Texas.

2. Defendant TESLA, Inc. ("TESLA") is a corporation organized and existing under the laws of the state of Delaware, with its primary place of business located at 1 Tesla Road, Austin, Texas 78725. TESLA may be served with summons on its registered agent CT Corporation, 1999 Bryan Street, Suite 900, Dallas, Texas 752016.

## JURISDICTION AND VENUE

3. Plaintiff seeks relief for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a). Accordingly, this Court has jurisdiction under 28 U.S.C. § 1331.

4. At all times material hereto, Defendant TESLA conducted business in Texas and was doing business in the State of Texas by employing Plaintiff in Austin, Texas. The causes of action asserted herein arose from and are connected to purposeful acts committed by Defendant during Plaintiff's employment in Austin, Texas

5. The claims asserted in this action arose within this district and a substantial portion of the acts and omissions giving rise to Plaintiff's claims occurred in Travis County, Texas. Furthermore, Defendant's principal place of business is in Austin, Texas Venue is therefore proper in this district and division under 28 U.S.C. § 1391.

## RESPONDEAT SUPERIOR AND RATIFICATION

6. Whenever it is alleged in this complaint that Defendant's officers, agents, servants, employees, or representatives committed an act and/or omission, it is alleged to be done with the full authorization or ratification of Defendant or in the normal and routine course and scope of employment.

## EXHAUSTION OF ADMINISTRATIVE PROCEDURES AND REMEDIES

7. Plaintiff timely filed with Equal Employment Opportunity Commission ("EEOC") a charge of discrimination and retaliation against Defendant TESLA. Plaintiff received a notice of her right to sue from the EEOC and timely filed this Complaint within those 90 days of receiving that notice of right to sue.

## FACTUAL BACKGROUND

8. Defendant is clean energy automotive company that designs, manufactures, and sells battery electric vehicles and related products and services.

9. Plaintiff was hired by Defendant on November 31, 2022, working as a Production Associate in the battery pack division of Defendant's manufacturing facility in Austin, Texas.

10. Soon after she began working for Defendant, Plaintiff started receiving significant unwanted and unwelcome personal attention from another Production Associate in the Model Y Battery Pack division (Kevin Thorton). For the first couple of weeks, Mr. Thornton would come to Plaintiff's work area and just stand and stare at Plaintiff.

11. Plaintiff thought Mr. Thornton's behavior was odd, especially since she did not even know him at the time. After a couple of weeks, Mr. Thornton approached Plaintiff and introduced himself, calling Plaintiff by her name (despite the fact that the two had never met).

12. Over the next couple of months, Mr. Thornton regularly came to Plaintiff's assigned workstation (which varied) and attempted to strike up conversations with her, mostly about the company and opportunities within Defendant's organization.

13. After several weeks, however, the conversations started to become more personal. Mr. Thornton began telling Plaintiff about his children and his personal life, including the fact that he was single. At one point, he shared that liked "older women" and was looking for someone to settle down with. It was clear to Plaintiff that he was expressing a desire to get involved romantically, and Plaintiff declined and explained that she was not interested.

14. At one point after, Mr. Thornton asked Plaintiff if she would consider being his "fuck buddy." Plaintiff expressed shock and resentment at that question. Mr. Thornton proceeded to describe to Plaintiff, in very sexually graphic terms, what people "these days" typically do on

3

first dates. Plaintiff again told Mr. Thornton that she was not interested and requested that she stop asking her. Mr. Thornton indicated that he was not going to give up.

15.     Indeed, Mr. Thornton persisted. He continued to frequently visit Plaintiff's workstation, trying to strike up personal conversations with Plaintiff. Mr. Thornton attempted to pry into Plaintiff's personal life and wanted to know who Plaintiff was talking to on the phone during her breaks. Mr. Thornton would pull Plaintiff's phone out of her pocket or pick it up off the nearby table to see who she had had conversations with.

16.     Mr. Thornton once sent Plaintiff his phone number via the Teams app and asked Plaintiff to call him and talk to him instead of others. Plaintiff refused, and continued to firmly express to him that she was not interested.  Mr. Thornton somehow obtained Plaintiff's phone number and started texting and asking Plaintiff out to dinner and drinks. Plaintiff continued to refuse, and he persisted.

17.     Mr. Thorton began following Plaintiff to the restroom on her breaks. Mr. Thorton was able to know when Plaintiff was taking a restroom break, as employees routinely utilized the teams app to obtain coverage for their station when they took restroom breaks.

18.     Occasionally, Mr. Thorton would hide in the restroom waiting for Plaintiff and would ask her to have sex with him in the restroom. Plaintiff always refused. Multiple times, Mr. Thornton grabbed Plaintiff's hand and placed it on his penis (over his clothing) and tell her that "he knew this is what she wanted." This happened on at least three separate occasions and, each time, Plaintiff snatched her hand away and pleaded with him to stop.

19.     About this time, three Team Lead positions became available and Plaintiff expressed interest to her supervisor in applying to one, as Plaintiff wanted to move up within the organization and eventually become a supervisor. Plaintiff was told that she could move to the

4

Nickel-Cadmium-Manganese battery unit (NCM) for a higher paying position, which she agreed to do. Unfortunately, by this time, Mr. Thorton was a Lead in NCM and was actively looking to be promoted to supervisor of that unit.

20. After Plaintiff's move to NCM to become a Process and Repair Technician, she was able to minimize personal interaction with Mr. Thorton, who was training in NCM. Plaintiff was focused on completing her online class and obtaining the necessary training.

21. However, one day after her move to NCM, Plaintiff began receiving pictures from Mr. Thorton via text. The pictures were extremely graphic, including pictures of his erect penis. Plaintiff was angry and told Mr. Thornton that the texts and photographs were entirely inappropriate and that he should immediately stop sending them to her. He responded and said that "his dick stays hard all day" and that he sent them to Plaintiff so that she could see "how big he is" and that she might change my mind about having sex with him. Plaintiff was disgusted and angry and demanded that Mr. Thornton stop.

22. While Plaintiff was attending her online classes, Mr. Thornton would come sit next to her and tell her that he "can go for hours" and that if Plaintiff were to agree to have sex with him, Plaintiff would "not be disappointed."

23. After Plaintiff told him again that these were inappropriate conversations, Mr. Thornton told Plaintiff that she was only going to be able to reject him a few more times, as he was soon going to become Plaintiff's supervisor and would have her returned to the production line and that he would ensure that Plaintiff remained there if she continued to refuse to have sex with him.

24. Soon thereafter, Mr. Thornton stopped training Plaintiff and failed or refused to notify Plaintiff what additional classes she needed to complete for the training. At one point, he

again grabbed Plaintiff's hand and place it on his erect penis (over his clothing) and said, "last chance."

25. Around this time, while she was filling in for another employee on the production line during that employee's break, Plaintiff injured her wrist grabbing some larger boxes. Plaintiff was told that she could not return to NCM due to the injury and returned to the production area, where she worked for several different supervisors, all of whom were friends with Mr. Thorton.

26. Mr. Thorton continued retaliating against Plaintiff for refusing to have sex with him. Plaintiff was constantly threatened with performance write-ups and assigned to perform tasks for Mr. Thorton that were not within her job description. Plaintiff felt alienated from the workers around her, who stopped talking to her and laughed at her for having to perform the more menial tasks.

27. At one point, Plaintiff was assigned to a trainer who actually had less experience than she did. It was clear to Plaintiff that Mr. Thorton was following through on his promise of sabotaging Plaintiff's career with Defendant because Plaintiff had refused his repeated advances and requests for sex.

28. Although Plaintiff had been reluctant to report the harassment for fear of further retaliation by Mr. Thorton, she decided that she had no other option at that point.

29. The first step in the process was reporting to Plaintiff's direct supervisor, Robie Sodhi. Plaintiff met with Mr. Sodhi in April 2023 and told him everything—the constant requests for sex, the pictures of Mr. Thorton's penis, the forced touching of Mr. Thorton's penis, and the retaliation/harassment by Mr. Thorton after Plaintiff refused to have sex with him in the restroom. Plaintiff explained to Mr. Sodhi that Mr. Thorton had told her that if she did not have sex with him (Mr. Thornton), she would lose her advancement opportunities with Defendant.

30. Plaintiff also reported the misconduct to Moody Mash, a human resources representative. Over the next month, Mr. Mash never responded to any of Plaintiff's messages or emails. Plaintiff eventually escalated the situation to Mr. Mash's supervisor in order to get a response.

31. When a meeting was finally scheduled, Plaintiff told human resources everything. Moody sent his report to Employee Relations, but the report was not a fair or fully accurate reflection of what Plaintiff had reported to Mr. Moody.

32. After two months of inaction by human resource and an inaccurate description of what she had actually reported, Plaintiff no longer felt safe. Plaintiff met with Employee Relations and provided the details that they requested (potential witnesses, names of supervisors, etc.) but Employee Relations *also* failed to take any action or, as far as Plaintiff knew or was made aware, conduct any further investigation.

33. After trying in vain to cope with the situation and given the fact that Defendant was taking no action at all to address the constant harassment, Plaintiff determined that the only option for her was to take an unpaid leave of absence. The stress and anxiety became too much to bear and Plaintiff was concerned about both her mental as well as physical well-being. Plaintiff notified Human Resources on or about September 6, 2023, that she would be taking a leave of absence.

34. On October 10, 2023, Plaintiff received a call from her supervisor (Dania Yanez) and human resources manager (Danielle Volkman) informing her that she was being terminated. Plaintiff told them that she believed that the termination was retaliation for having reported rampant discrimination and harassment at Defendant's manufacturing facility.

## CAUSES OF ACTION

### Count One: Sexual Harassment under Title VII
### (*Quid Pro Quo* and Hostile Work Environment)

35. Plaintiff incorporates and realleges paragraphs 1 through 34 of this Complaint as if fully set forth here.

36. Plaintiff alleges that Defendant subjected her to a sexually hostile work environment in violation of § 42 U.S.C. § 2000e-2 *et seq*.

37. Plaintiff is a member of a protected class (female). Plaintiff was subjected to unwelcome conduct of a sexual nature which continued between December 2022 through her termination on October 10, 2023. 42 U.S.C. § 2000e(f).

38. Defendant is an employer within the meaning of Title VII. 42 U.S.C. § 2000e(b).

39. All conditions precedent to filing this action for discrimination under federal law have been met.

40. Defendant, by and through the actions of its managers, agents, representatives, and employees, violated Title VII, as amended, by harassing Plaintiff and/or creating a hostile work environment and retaliating against Plaintiff in connection with compensation, terms, conditions or privileges of employment because of Plaintiff's complaints of harassment.

41. Defendant, by and through the actions of its managers, agents, representatives, and employees, maliciously and recklessly violated its own established rules and procedures to inflict pain and suffering upon the Plaintiff.

42. Defendant allowed a sexually hostile work environment that targeted female employees to persist.

43. Plaintiff complained about the sexual harassment/conduct in accordance with Defendant's policies and procedure but her complaints were ignored and Defendant failed or

refused to investigate and take immediate and appropriate corrective action. Defendant failed to exercise reasonable care to prevent the aforementioned and described sexual harassment and sexually hostile work environment from occurring.

44. Plaintiff would not have been subjected to the harassment but for her gender, as evidenced by the type of remarks and conduct directed towards her.

45. The harassment of which Plaintiff complains was severe and pervasive and altered the terms and conditions of her employment and created a hostile and abusive work environment.

46. Plaintiff complained of the harassment to Human Resources in accordance with Defendant's policy and procedures. Defendant knew or should have known about the harassment and failed to take prompt remedial action.

47. Defendant failed to exercise reasonable care to prevent the aforementioned and described sexual harassment and sexually hostile work environment from occurring. Defendant further failed to exercise reasonable care to correct promptly the aforementioned and described sexually harassing behavior.

48. As a result of Defendant's conduct, Plaintiff has suffered and will continue to suffer pecuniary losses, including but not limited to, lost wages and other benefits associated with her employment.

49. As a result of Defendant's conduct, Plaintiff has been caused to and did suffer and continues to suffer severe anguish, humiliation, embarrassment, fright, shock, pain, discomfort, and anxiety. Plaintiff does not know at this time the exact duration or permanence of said injuries, but is informed and believes, and thereon alleges, that some if not all of the injuries are reasonably certain to be permanent in character.

50. Plaintiff is entitled to an award of attorney fees and costs under Title VII, 42 U.S.C. § 2000e-5(k).

51. Such discrimination by Defendant against Plaintiff was intentional. Accordingly, Plaintiff is entitled to recover damages from Defendant for emotional pain and suffering, inconvenience, loss of enjoyment of life and other nonpecuniary losses.

52. Defendant's actions were done with malice and/or with reckless indifference to Plaintiff's federally-protected rights. Plaintiff is thereby entitled to punitive damages.

53. Plaintiff requests relief as described in the Prayer for Relief below.

### Count Two: Retaliation under Title VII

54. Plaintiff incorporates and realleges paragraphs 1 through 53 of this Complaint as if fully set forth here.

55. Plaintiff has satisfied all jurisdictional prerequisites in connection with her claims under Title VII.

56. Plaintiff engaged in protected activity by, among other things, complaining about the sexual harassment of Defendant's managers, agents, representatives, and employees.

57. Plaintiff reasonably believed the sexual behavior and conduct involving Defendant's managers, agents, representatives, and employees constituted unlawful sexual harassment and created a hostile work environment.

58. Plaintiff suffered numerous adverse actions, including but not limited to, reassignments, reduction of job responsibilities, continued harassment, and ultimately, termination.

59. Defendant, through the illegal actions of its agers, agents, representatives, and employees, retaliated against Plaintiff by materially altering the conditions of her employment and, by terminating her for her actions in complaining about the sexual harassment.

60. There was a causal connection between Plaintiff's participation in the protected activities described above and the adverse employment actions taken against Plaintiff by Defendants. But for the fact that the Plaintiff engaged in these protected activities, Plaintiff would not have suffered the adverse employment actions.

61. The employment practices complained of above were intentional.

62. As a result of Defendant's conduct, Plaintiff has suffered and will continue to suffer pecuniary losses, including but not limited to, lost wages and other benefits associated with her employment

63. As a result of Defendant's retaliatory conduct, Plaintiff has suffered and will continue to suffer compensatory damages which were a natural, probable and foreseeable result of Defendant's actions.

64. Such conduct by Defendant was intentional and, as a result of Defendant's retaliatory conduct, Plaintiff has suffered nonpecuniary losses, including but not limited to, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses for which she seeks recovery under Title VII.

65. Defendant's actions were done with malice and/or with reckless indifference to Plaintiff's federally-protected rights. Plaintiff is thereby entitled to punitive damages.

66. Plaintiff has been generally damaged in an amount within the jurisdictional limits of this Court.

67. As a result of Defendant's acts as alleged herein, Plaintiff is entitled to reasonable attorneys' fees and costs of suit, including reasonable expert fees, as provided in Title VII of the Civil Rights of 1964, as amended.

68. Plaintiff requests relief as described in the Prayer for Relief below.

## JURY DEMAND

69. Plaintiff demands a trial by jury as to all issues.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Chantanee Moore respectfully requests that on final trial, judgment be granted in favor of Ms. Moore against Defendant TESLA, Inc. awarding Plaintiff as follows:

a. All actual damages, including back pay, front pay, and benefits;

b. Compensatory damages, in the maximum amount allowed by law;

c. Punitive/exemplary damages;

d. All reasonable and necessary attorney's fees and reasonable and costs of suit, including expert fees as the Court deems appropriate;

e. Prejudgment and post-judgment interest, in the maximum amount allowed by law; and

f. Such other and further legal and equitable relief to which Plaintiff may be justly entitled.

Respectfully submitted December 6, 2024.

/s/ *Kevin M. Duddlesten*
Kevin M. Duddlesten
Texas Bar No. 00793644
DUDDLESTEN LAW GROUP, PLLC
4347 W Northwest Hwy Ste 130, PMB 325
Dallas, TX 75220
Phone: (214) 833-5228
Facsimile: (469) 457-6785
Email: kevin@duddlestenlawgroup.com

ATTORNEYS FOR THE PLAINTIFF